**BURSOR & FISHER, P.A.**
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Rachel L. Miller (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-mail: rmiller@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEMMA RIVERA and MARISA FRANZ, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br>    v.<br><br>KNIX WEAR, INC.,<br><br>               Defendant. | Case No. 5:22-cv-02137-EJD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Gemma Rivera and Marisa Franz ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Knix Wear, Inc. ("Defendant" or "Knix"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiffs bring this class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased Defendant's menstrual underwear (the "Products"), which are unfit for their intended use because they contain heightened levels of fluorine which is an indicator of unsafe per- and polyfluoroalkyl substances ("PFAS").  The Products, which are used for personal hygiene purposes to collect and/or absorb menstrual fluid, is formulated, designed, manufactured, advertised, distributed, and sold by Defendant or its agents to consumers, including Plaintiffs, across the United States.

2.    PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[1]

3.    In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health and how the risks may be underestimated.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[2]

---

[1] Nicholas J. Herkert, et. al., Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity, *Environ. Sci. Technol*. 2022, 56, 1162-1173, 1162.

[2] Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Mar. 22, 2022).

4.      Relevantly, despite Defendant's representations to consumers that its products are "Fluorine free," "Free from PFAS and other toxic chemicals," and "designed to be both safe and effective," independent research conducted by Mamavation and an EPA-certified laboratory determined that the Products contain **373 parts per million (ppm) of fluorine**, which is an indicator that the Products contain PFAS.[3]

5.      This is particularly worrisome given the nature of the Products.  Because the underwear is "right up against the vagina" and rests "snug[ly] against the vulva for an extended period of time" consumers are at a heightened risk of exposure to PFAS.[4]

6.      Based on Defendant's representations, a reasonable consumer would expect that the Products can be safely used as marketed and sold.  However, the Products are not safe, posing a significant health risk to unsuspecting consumers.  Yet, neither before or at the time of purchase does Defendant notify consumers like Plaintiffs that their Products are unsafe, contain heightened levels of fluorine indicating the presence of PFAS, or should otherwise be used with caution.

7.      Accordingly, Plaintiffs bring their claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had And Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation; (12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; (14) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.; and (15) Negligent Failure to Warn.

---

[3] Leah Segedie, "Report: 65% of Period Underwear Tested Likely Contaminated with PFAS Chemicals," May 24, 2021, https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html (last accessed April 1, 2022).

[4] Leah Segedie, "Report: 65% of Period Underweat Tested Likely Contaminated with PFAS Chemicals," May 24, 2021, https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html (last accessed April 1, 2022).

**PARTIES**

8.     Plaintiff Gemma Rivera is a natural person and a citizen of California who resides in San Jose, California.  In approximately February 2022, Ms. Rivera purchased Defendant's Product directly from Knix's website.  Prior to her purchase, Ms. Rivera reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein, including that the Product was safe and sustainable, free of fluorine and otherwise PFAS-free.  Ms. Rivera understood that based on Defendant's claims, the Product was safe for use, a sustainable product that is free of fluorine and otherwise PFAS-free.  Ms. Rivera reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.   As a direct result of Defendant's material misrepresentations and omissions, Ms. Rivera suffered and continues to suffer, economic injuries.

9.     Ms. Rivera continues to desire to purchase the Product from Defendant that are free of PFAS.  However, Ms. Rivera is unable to determine if the Product is actually free of fluorine and otherwise PFAS-free.  Ms. Rivera understands that the composition of the Products may change over time.  But as long as Defendant may use the phrases "Free of Fluorine" and "PFAS free" to describe the Product that actually contains heightened levels of fluorine, which is indicative of the presence of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's Products.  Ms. Rivera is further likely to repeatedly be misled by Defendant's conduct, unless and until Defendant is compelled to ensure that Products marketed and advertised as "Free of Fluorine" and "PFAS free," are in fact free of fluorine and PFAS.

10.     Plaintiff Marisa Franz is a natural person and a citizen of California who resides in San Jose, California.  In approximately May 2021, Ms. Franz purchased Defendant's Product directly from Knix's website.  Prior to her purchase, Ms. Franz reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein, including that the Product was

safe and sustainable, and otherwise PFAS-free.  Ms. Franz understood that based on Defendant's claims, the Product was safe for use and a sustainable product and otherwise PFAS-free.  Ms. Franz reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Ms. Franz suffered and continues to suffer, economic injuries.

11.     Ms. Franz continues to desire to purchase the Product from Defendant that are free of fluorine and PFAS.  However, Ms. Franz is unable to determine if the Product is actually free of fluorine and PFAS.  Ms. Franz understands that the composition of the Products may change over time.  But as long as Defendant may use the phrase "Fluorine free" and "PFAS free" to describe the Product that actually contains heightened levels of fluorine, which is indicative of the presence of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's Products.  Ms. Franz is further likely to repeatedly be misled by Defendant's conduct, unless and until Defendant is compelled to ensure that Products marketed and advertised as "Fluorine free" and "PFAS free," are in fact free of fluorine and PFAS.

12.     Defendant Knix Wear, Inc. is a foreign corporation with its principal place of business located in Toronto, ON, Canada.  Defendant describes itself "committed to supporting [your] beautiful community . . . includ[ing] the people within it . . .[and] the planet that we live on," and that your "aim is to reduce [your] environmental impact."[5]

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, the aggregate claims of all members of the proposed Class

---

[5] Knix, "Sustainability at Knix," https://knix.com/collections/sustainability (last accessed Apr. 1, 2022).

exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Defendant.

14.     This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of California, and further, because Plaintiffs purchased the Products in this District.

15.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiffs' claims occurred, where Defendant transacts business, and where Plaintiffs purchased the Products.

## FACTUAL ALLEGATIONS

### A.     The Costs And Opportunities Presented By Period Products

16.     According to Water Aid America, "[t]he average wom[a]n will menstruate once a month, for roughly 35 to 40 years of her life.  That's approximately 3000 days—more than 8 years— of periods during her lifetime."[6]

17.     On average, "a woman uses 350 packs of plastic sanitary pads in her lifetime," spending roughly $2,000 on tampons alone over the course of her life.[7]

18.     In 2017, total sales for feminine hygiene products in the U.S. topped $5.9 billion.[8]

19.     According to Grand View Research, the growth in spending on such products has been driven by: (1) growing awareness of the need for such products, (2) the increase in disposable

---

[6] Water Aid, "Having your period shouldn't hold you back," https://www.wateraid.org/us/stories/International-womens-day-having-a-period-shouldnt-hold-women-back (last accessed Apr. 4, 2022).
[7] Duquesne University School of Nursing, "The Ultimate Guide to Feminine Hygiene," https://onlinenursing.duq.edu/master-science-nursing/the-ultimate-guide-to-feminine-hygiene/ (last accessed Apr. 4, 2022).
[8] *Id.*

income; and (3) the development of products that are easy to use and that are less harmful to the environment.[9]

20.     Amidst this increase in spending, there is a growing public health concern about the chemicals used in feminine hygiene products.  Potential negative health effects stemming from the chemicals in tampons and pads, in addition to environmental concerns related to single-use plastics, have caused many women to seek out alternative menstrual hygiene products.

21.     Thus, according to the Shelton Group, nearly 40% of women aged 18-34 have switched or are considering switching to reusable products to manage their periods.

22.     Accordingly, awareness of, and an inclination toward, safer products is guiding consumer choices.  Consumers are therefore willingly to pay a premium for personal hygiene products like period underwear compared to cheaper disposable alternatives such as tampons.  This is because consumers prefer an easier, safer, and more sustainable approach to feminine hygiene care compared to traditional single-use feminine hygiene products.

23.     One survey, for instance, found that "[w]hen asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[10] Significantly, "[t]hese factors won out over convenience, country of origin, environmental impact, product performance, price and social / human rights / labor impact."[11]

24.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more and 17% willing to spend 1-5% more."[12]

25.     Thus, there is enormous incentive for companies such as Defendant to market their products as safe.  Indeed, at every possible opportunity, Defendant represents the safety of the Products, including on its website.  Examples of these representations are included below.

---

[9] *Id.*

[10] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).

[11] *Id.* at 3.

[12] *Id.*

1
2
3
4
5
6
7
8
9
10
11



### Certifications

All Knix products are PFAS free. All of the main fabrics used in our bras and underwear are also OEKO-TEX® certified— meaning they've been tested and cleared for harmful substances. For more details about manufacturing and to read copies of the reports, check out our blog below.

**OEKO-TEX®**     **Blog**

12   The patented technology built into Knix underwear locks in moisture, helps get rid of odor a
13   stops leaks. Designed to be both safe and effective, it's 100% free from PFAS and is OEKO-
      TEX® certified.
14

15   Knix News                                                            January 21, 2020
                                                                          Team Knix / CULTURE
16   # Yes. Knix Underwear are Toxic
17   # Chemical Free

18   The thing that we're most proud of at Knix is that people trust us with their bodies. They trust us to photograph them, they
19   trust us to share their stories, and above all— they trust us to make intimates that are safe, non-toxic and chemical free.

20   Recently, a necessary spotlight was cast towards exactly what goes into making period underwear. What makes them
      leakproof? What materials are used? Are these fabrics safe? In short: *What exactly am I putting near my vagina?*
21

22   ## What are PFAS?

23   PFAS (polyfluoroalkyl substances) are a large family of synthetic chemicals that are commonly used as a stain or water
      repellent. The two most common are **PFOA** (perfluorooctanoic acid) and **PFOS** (perfluorooctane sulfonate). You might have
      heard about them in the news lately, as recent studies have revealed them to have negative effects on your health and the
24   environment. They're harmful because they can't be broken down — which could be especially dangerous if they're
      added to underwear, coming in direct contact with an extra sensitive area of your body.
25

26   At Knix, we put a lot of care into crafting great products and a lot of thought towards creating underwear that's both safe
      *and* effective. We've been intentional about avoiding stain repellents and fabric treatments (these same repellents are
27   often used on carpets or industrial machines— yikes!). For starters, our Leakproof Underwear materials and technology are
      manufactured in Italy. Not only are they manufactured here because of the higher quality, but also because the European
      Union has a substance restriction on toxic PFAS chemicals.

28

---

26.     In fact, after concerns about the presence of PFAS in period underwear were expressed, Joanna Griffiths, the founder of Knix, publicly stated that she was confident that Defendant's products were PFAS-free.[13]

27.     Moreover, Defendant has also represented that its Products are "Fluorine free," as set out in the below representations:

> There are 9000 different kinds of PFAS, but there aren't tests available for all of them yet. However as a community member gratefully pointed out to us, *all* PFAS contain Fluorine (this is the F in PFAS). What does this mean? If our underwear was free from Fluorine, we'd be free of all PFAS.
>
> Because of this feedback, we sought out extra testing to confirm that there is **no Fluorine in our Leakproof Underwear.**
>
> After our initial tests, we began ongoing testing for Fluorine in January 2020, and we are happy to report that our Leakproof Underwear are **Fluorine free.** Testing for Fluorine is now part of our testing process going forward. You can check out what a negative Fluorine report looks like at the bottom of this post.

28.     Prior to their purchases, Plaintiffs saw these and like representations, and believed that the Products were safe for use and were otherwise sustainable.  As a result, Plaintiffs relied on these and like representations in purchasing the Products.  However, as described in the next section, Defendant's Products are not safe for use or sustainable, and poses a critical risk to the safety and health of consumers and the environment.

**B.      Defendant's Period Underwear Contain Heightened Levels of Fluorine Which Is Independently Harmful And Which Indicates That The Products Contain Harmful PFAS**

29.     PFAS are a category of chemicals which may be used to enhance the performance of textiles and apparel.[14]

---

[13] Elizabeth Segran, "Period Underwear Could Be Toxic. Should It Be Regulated?," (Jan. 23, 2020), https://www.fastcompany.com/90454555/period-underwear-could-be-toxic-should-it-be-regulated. (last accessed April 1, 2022).

[14] https://www.voguebusiness.com/sustainability/can-fashion-eliminate-forever-chemicals

30.     PFAS chemical treatments are typically used on textiles in order to make them water repellant and/or stain resistant.[15]

31.     But PFAS are not necessary for this intended outcome.   Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no detectable level of fluorine.[16]   Accordingly, Defendant would have had knowledge that they could produce the Product without the heightened levels of fluorine which are indicative of PFAS that are inherent in its current composition.

32.     Yet, Defendant chose not to, and instead concealed this information from consumers, to increase revenues by the cost savings associated with the use of these chemicals.

33.     This has not been without consequences for consumers, as heightened levels of fluorine which indicates the presence of PFAS, is particularly problematic to human health and the environment because they resist degradation in the environment and can remain in the body for years after exposure.[17]

34.     Researchers are concerned about dermal contact with PFAS because such exposure poses the same health hazards as ingesting the compound in water or food[18] and PFAS are not quickly excreted from the body like other hormone-disrupting chemicals.[19]

35.     Notably, the vagina and vulva absorb chemicals at a higher rate than other areas of the body.[20]

---

[15] Id.

[16] Segedie, "Report: 65% of Period Underweat Tested Likely Contaminated with PFAS Chemicals," May 24, 2021, https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html (last accessed April 1, 2022).

[17] Leah Segedie, "Report: 65% of Period Underwear Tested Likely Contaminated with PFAS Chemicals," May 24, 2021, https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html (last accessed April 1, 2022).

[18] Ketura Persellin, "Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion," Environmental Working Group (Jan. 13, 2020), https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last accessed April 6, 2022).

[19] Id.

[20] Wendee Nicole, "A Question for Women's Health: Chemicals in Feminine Hygiene Products and Personal Lubricants," Mar. 1, 2014, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3948026/, (last accessed April 1, 2022).

36.     PFAS are also known to migrate during laundering, meaning that clothing items which are treated with PFAS with chemicals onto the other clothing and into waterways.[21]

37.     Recognizing the concerns about the potential for PFAS in menstrual underwear, Mamavation, a nonprofit organization that conducts scientific studies on toxic chemicals, in conjunction with an EPA-certified laboratory, tested 14 different brands of the underwear for PFAS.

38.     Specifically, the study tested 20 different pairs of underwear for fluorine, the chemical that unites all PFAS chemicals.  The study used a 100 parts-per-million metric, focusing on brands with amounts of fluorine in excess of 100 ppm, in order to separate out those brands that intentionally add fluorine to their underwear.

39.     Mamavation notes that it "tested the most popular period panties (some up to 4x) looking for fluorine, the chemical that unites all PFAS chemicals" and that "[t]his is important to understand because there are thousands of PFAS chemicals in commerce and most are not even possible to find because we do not have the tests available, [so] we are testing for fluorine instead."[22]

40.     Indeed, this approach "is exactly what the food packaging industry does to determine whether PFAS w[ere] 'intentionally added' and can be composed or not."[23]  Mamavation notes that "[b]ecause testing for fluorine is the only standard that is out there, we've adapted this to fabrics and are using it for this investigation on period underwear."[24]

41.     To this point, Mamavation cites to the Biodegradable Products Institute ("BPI"), which has adopted 100ppm as a threshold.[25]  Likewise, the Supply Chain Solutions Center ("SCSC") notes that it "recommends that companies systematically screen [its products] using a total fluorine

---

[21] Ministry of Environment and Food, The Danish Environmental Protection Agency, "Polyfluoroalkyl sub-stances (PFASs) in Textiles for Children," 2015, https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf (last accessed April 1, 2022).
[22] *See supra* n. 18.
[23] *Id.*
[24] *Id.*
[25] *Id.; see also*, Biodegradable Products Institute, "Fluorinated Chemicals and BPI Certification," https://bpiworld.org/BPI-Blog.html/6650181 (last accessed Apr. 6, 2022).

method and investigate levels over 100 parts per million (ppm), which indicates intentional use."[26]

42.     SCSC notes that "[t]he total fluorine method measures all forms of PFAS in the fibers and does not identify individual PFAS.  It is an effective screening tool to detect intentionally added PFAS, and results should prompt a discussion with the supplier[.]"[27]

43.     As noted above, Defendant has also recognized the significance of fluorine, noting that that "[t]here are 9000 different kinds of PFAS, but there aren't tests available for all of them yet.  However as a community member gratefully pointed out to us, all PFAS contain Fluorine (this is the F in PFAS).  What does this mean?  If our underwear was free from Fluorine, we'd be free of all PFAS."[28]

44.     Defendant continues that "Because of this feedback, we sought out extra testing to confirm that there is no Fluorine in our Leakproof Underwear.  After our initial tests, we began ongoing testing for Fluorine in January 2020, and we are happy to report that our Leakproof Underwear are Fluorine free.  Testing for Fluorine is now part of our testing process going forward."[29]

45.     However, this is wrong.  Mamavation's study determined that exactly 3 brands of the period underwear had levels of fluorine over 100 ppm, including Defendant's High Rise period underwear, which contained 373 ppm of fluorine.

46.     Thus, even if Defendant's Products did not contain one of the 9,000 available PFAS Defendant has intentionally misrepresented that its Products do not contain Fluorine.

47.     But Defendant cannot reasonably assure consumers that the Products do not contain PFAS.  As Michael Hansen, PhD, senior scientist at Consumer Reports notes, "no company should

---

[26] Supply Chain Solutions Center, "Testing for PFAS in food packaging," https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/#:~:text=The%20total%20fluorine%20method%20provides,certification%20program%20for%20fiber%20products. (last accessed Apr. 6, 2022).
[27] Id.
[28] Knix, "Yes. Knix Underwear are Toxic Chemical Free," (Jan. 21, 2020), https://knix.com/blogs/knix-blog/yes-knix-underwear-are-toxic-chemical-free (last accessed Apr. 6, 2022).
[29] Id.

tell consumers that their products are 100 percent free of PFAS."[30]

48.     Besides, as noted above, Defendant, by its own admission, has not tested for all varieties of PFAS.

49.     Moreover, Mamavation reports that it "interviewed Ben Mead, Managing Director of Hohenstein Institute America, which is the company that manages the OEKO-TEX standard in the United States. [Mr. Mead] made it clear to us in an interview over the phone that OEKO-TEX tests for only 30+ [of] the most common PFAS chemicals directly like PFOA and they do not test their fabrics for fluorine at all."[31]

50.     This is significant because as the images set out above make clear, Defendant bases it non-harmful substances claims on that fact that its Products are OEKO-TEX certified.

51.     But just because Defendant's Products have that certification does not mean that they are safe, because as noted they contain fluorine which is independently concerning.

52.     According to the Technical University of Munich, "Fluorine is the most reactive chemical element and highly toxic."[32]

53.     Live Science confirms this, noting that "[w]hile small amounts of fluorine are essential for maintaining the strength of our bones and teeth, too much can have the reverse effect of causing osteoporosis or tooth decay, as well as potentially harming the kidneys, nerves, and muscles."[33]

---

[30] Kevin Loria, "Dangerous Chemicals Are in Your Food Packaging," *Consumer Reports* (Mar. 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited Apr. 7, 2022).

[31] *See supra*, n. 3.

[32] Technical University of Munich (TUM). "Fluorine: Toxic and aggressive, but widely used: Investigations with neutrons settle scientific dispute about the structure of solid fluorine." ScienceDaily. ScienceDaily, 27 March 2019. www.sciencedaily.com/releases/2019/03/190327112637.htm (last visited Apr. 6, 2022).

[33] Rachel Ross, "Facts About Fluorine," *Live Science* (Aug. 21, 2018), https://www.livescience.com/28779-fluorine.html (last visited Apr. 6, 2022).

54.     And Science Notes describes the effects of fluorine in more detail, stating that they are "comparable to those of pure chlorine, irritating eyes and mucous membranes and damaging the liver and kidneys."[34]

55.     A report published in Toxicology Mechanisms and Methods also notes that "[d]ue to its insatiable appetite for calcium, fluorine . . . likely represents a form of chemistry that is incompatible with biological tissues and organ system functions.  Based on an analysis of the effects of fluorine demonstrated consistently in the literature, safe levels have not been determined nor standardized" but that "the National Research Counsel (NRC), offer[s] strong support for an immediate reconsideration concerning risk vs benefit."[35]

56.     One source of measurement for safe levels is the U.S. Environmental Protection Agency's maximum limit of 4 ppm for drinking water, noting that above that *fluoride* becomes problematic to human health once that level is surpassed.[36]

57.     The U.S. Public Health Service recommends a maximum of only 0.7 ppm.[37]

58.     These are useful benchmarks as fluoride and fluorine have significant overlaps in their chemical properties, with the latter exposing humans and the environment to greater toxicity,[38] and as noted above, drinking water and vaginal exposure both represent forms of ingestion.

59.     But this is not the only concern.  The dangers in the presence of fluorine does not end there as fluorine indicates the existence of PFAS and it is beyond dispute that PFAS are harmful to the human body.  In a 2019 study, for example, the U.S. Department of Health and Human Services'

---

[34] Ann Hemenstine, "What Is Fluoride?  Fluoride vs. Fluorine" *Science Notes* (Sept. 30, 2021), https://sciencenotes.org/what-is-fluoride-fluoride-vs-fluorine/ (last visited Apr. 6, 2022).

[35] Jeff Prystupa, "Fluorine – A Current Literature review.  An NRC and ATSDR based review of safety standards for exposure to fluorine and fluorides," *Toxicology Mechanisms and Methods*, Vol. 21, Iss. 2 (2011), https://www.tandfonline.com/doi/abs/10.3109/15376516.2010.542931 (last visited Apr. 6, 2022).

[36] Association of State and Territorial Dental Directors, "Natural Fluoride in Drinking Water," https://www.astdd.org/docs/natural-fluoride-fact-sheet-9-14-2016.pdf (last visited Apr. 6, 2022).

[37] *Id.*

[38] Royal Society of Chemistry, "Fluorine," https://www.rsc.org/periodic-table/element/9/fluorine (last visited Apr. 6, 2022).

National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[39]

60.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[40]



61.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[41]

[39] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last accessed Mar. 22, 2022).
[40] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Mar. 22, 2022).
[41] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 22, 2022).

62.     In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

63.     As noted, the harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrate by the figure below.[42]



64.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.[43]

**C.     Defendant's Misrepresentations and Omissions Are Actionable**

65.     Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as "Fluorine Free" and "PFAS free" and "designed to be both safe and effective," when they are not.

66.     Plaintiffs and Class Members bargained for menstrual underwear that are PFAS and fluorine free, and were deprived of the basis of their bargain when Defendant sold them a product

---

[42] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Apr. 1, 2022).
[43] *Id.*

containing fluorine which indicates the presence of PFAS, dangerous substances with well-known health consequences.

67.    No reasonable consumer would expect that a product marketed as "Fluorine free" and "PFAS free" and "designed to be both safe and effective" would pose a risk to their health, safety, and wellbeing, or that it may contain dangerous levels of fluorine and PFAS, which are indisputably linked to harmful health effects in humans.  Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Products.

68.    As the Products expose consumers to fluorine which is indicative of PFAS and that such exposure poses a risk to consumers' health, the Products are not fit for use by humans.  Plaintiffs and the Class are further entitled to damages for the injury sustained in the exposure to high levels of fluorine which is indicative of the existence of PFAS, damages related to Defendant's conduct, and injunctive relief.

69.    Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiffs and Class members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health effects.  Nonetheless, Defendant concealed and affirmatively misrepresented the Product, as discussed herein.

70.    Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendants had regarding the presence of fluorine and potential presence of PFAS and their failure to disclose the existence of these in the Products to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

71.    WHO:  Defendant made material misrepresentations and/or omissions of fact about the Products through their labeling, website representations, and marketing statements, which include the statement that the Products are "Fluorine free" and "PFAS free."  These representations also constitute omitted material information regarding harmful chemicals in the Products.

72.    WHAT:  Defendant's conduct here was, and continues to be, fraudulent because it

omitted and concealed that the Products contain may substances—fluorine which may indicate the presence of PFAS—that are widely known to have significant health repercussions.   Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe, when they are not.   Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet they continued to pervasively market the Products in this manner.

73.   WHEN:   Defendant made material misrepresentations and/or omissions during the putative Class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products may contain harmful substances.

74.   WHERE:   Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

75.   HOW: Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of fluorine which is indicative of the presence of PFAS.

76.   WHY:   Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Product, the effect of which was that Defendant profited by selling the Products to tens of thousands of consumers.

77.   INJURY:   Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

78.   Defendant would have had actual knowledge for years that the Product contains harmful chemicals such as fluorine which indicates the presence of PFAS.

79.   Although Defendant was aware of the deception in its labeling given the inclusion of fluorine which is indicative of PFAS in the Product despite claims of the Product's safety and

sustainability, they took no steps to warn Plaintiff or Class Members of risks related to fluorine which is indicative of PFAS in the Product.

80.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Product.  Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

81.     Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Product is safe and sustainable.

82.     Defendant concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Product.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members.   Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

83.     The fluorine which indicates the presence of PFAS included in the formulation, design and/or manufacture of the Product were not reasonably detectible to Plaintiffs and Class Members.

84.     At all times, Defendant actively and intentionally concealed the existence of the fluorine which indicates the existence of PFAS and failed to inform Plaintiff or Class Members of this risk.  Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

85.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals such as fluorine which indicates the existence of PFAS.

86.     Defendant concealed or misrepresented this information for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

87.     As a result of Defendant's active concealment of the fluorine which indicates the presence of PFAS and/or failure to inform Plaintiffs and Class Members of the fluorine and PFAS,

1     any and all applicable statute of limitations otherwise applicable to the allegations herein have been

2     tolled. Furthermore, Defendant is estopped from relying on any statute of limitations in light of its

3     active concealment of the potentially harmful nature of the Product.

4         88.     Further, the causes of action alleged herein did not accrue until Plaintiffs and Class

5     Members discovered that the Product contained fluorine which indicates the existence of PFAS,

6     which, at the very earliest, would have been in February 2022. Plaintiff and Class Members had no

7     realistic ability to discern that the Product contained PFAS until after the Mamavation study.

8     Plaintiffs and Class Members were hampered in their ability to discover their causes of action

9     because of Defendant's active concealment of the existence of fluorine which indicates the existence

10    of PFAS in the Product and of the Product's true nature.

11                               **CLASS ALLEGATIONS**

12         89.     Plaintiffs bring this nationwide class action pursuant to 23(b)(2), 23(b)(3), and

13    23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all

14    persons in the United States who purchased the Product (the "Class"). Excluded from the Class are

15    persons who made such purchases for purposes of resale.

16         90.     Plaintiffs Rivera and Franz also seeks to represent a subclass of all Class Members

17    who purchased the Product in the State of California (the "California Subclass"). Excluded from the

18    California Subclass are persons who made such purchases for purpose of resale.

19         91.     As a result of additional information obtained through further investigation and

20    discovery, the above-described Classes may be modified or narrowed as appropriate, including

21    through the use of multi-state subclasses.

22         92.     At this time, Plaintiffs do not know the exact number of members of the

23    aforementioned Class and Subclasses ("Class Members" or "Subclass Members"). However, given

24    the nature of the claims and the number of retail stores in the United States selling Defendant's

25    Product, Plaintiffs believe that Class and Subclass Members are so numerous that joinder of all

26    members is impracticable.

27         93.     There is a well-defined community of interest in the questions of law and facts

28

involved in this case.  Questions of law and facts common to members of the Class predominate over questions that may affect individual Class Members include:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d)     whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

94.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as the California Unfair Competition Law.

95.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased, in a typical consumer setting, Defendant's Product, and Plaintiffs sustained damages from Defendant's wrongful conduct.

96.     Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

97.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or

contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.   Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

**COUNT I**
**(Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**

98.     Plaintiffs reallege and reincorporates by reference all paragraphs alleged above.

99.     Plaintiffs Rivera and Franz bring this claim individually and on behalf of the proposed California Subclass against Defendant.

100.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."   For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

101.    By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

102.    Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

103.    As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.   In addition, Defendant has committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

104.    Plaintiffs Rivera and Franz and members of the California Subclass reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

105.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

106.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

107.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

108.     Plaintiffs Rivera and Franz and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

109.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

110.     Plaintiffs Rivera and Franz and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

111.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs Rivera and Franz and the other California Subclass Members.

112.     Pursuant to California Business and Professional Code § 17203, Plaintiffs Rivera and

Franz and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs Rivera and Franz and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs and the California Subclass' attorneys' fees and costs.

<u>**COUNT II**</u>
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code § 1750, *et seq.*)**

113.    Plaintiffs Rivera and Franz reallege and reincorporate by reference all paragraphs alleged above.

114.    Plaintiffs Rivera and Franz bring this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

115.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

116.    Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

117.    Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

118.    Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as "Fluorine free" and "PFAS free", when in fact the Products contain fluorine which indicates that they also contain PFAS.

119.    Defendant's representations are wrong as the Products contain heightened levels of fluorine which indicates the existence of PFAS and thus, cannot properly be marketed as "Fluorine free" and "PFAS free" because they contain excessive levels of fluorine that subject unsuspecting consumers to significant health risks.

120.    Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiffs or California Subclass Members.

121.   Defendant made partial representations to Plaintiffs Franz and Rivera and California Subclass Members, while suppressing the true nature of the Product.  Specifically, by displaying the Products and describing the Products as safe, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health. As described above, Defendant was in receipt of knowledge pertaining to fluorine which indicates the existence of PFAS in its Product and yet for a period of several years has continued to Product. Moreover, Defendant affirmatively misrepresented the Products despite its knowledge that the Products were not as advertised.

122.   Plaintiffs Rivera and Franz and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

123.   On February 25, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant responded to the letter on March 25, 2022, refusing to make any changes to the Products, or to pull the Products from the marketplace.

124.   Accordingly, Plaintiffs Rivera and Franz and the California Subclass Members seek all relief available under the CLRA, including restitution, damages, injunctive relief, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## COUNT III
### (Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)

125.   Plaintiffs Rivera and Franz reallege and reincorporate by reference all paragraphs alleged above.

126.     Plaintiffs Rivera and Franz bring this claim individually and on behalf of all members of the California Subclasses.

127.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

128.     The Product at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

129.     Plaintiffs Rivera and Franz and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

130.     Defendant is in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

131.     Defendant impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements.  Defendant breached these implied warranties because the Products were unsafe for use.  Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

132.     Plaintiffs and California Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

133.     The Product was not altered by Plaintiffs or the California Subclass Members.

134.    The Product was defective at the time of sale when they it the exclusive control of Defendant.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

135.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

136.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Product, namely, that they were unfit for use and posed a significant safety risk.

137.    Plaintiffs and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

**COUNT IV**
**(Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq*.)**

138.    Plaintiffs Rivera and Franz individually and on behalf of the California Subclass incorporate by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

139.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Product as "Fluorine free" and "PFAS free" when, in fact, the Products contain fluorine which indicates the Products may contain PFAS.

140.    By its actions, Defendant disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

141.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the

Products contain substances that pose a significant risk to the health and wellbeing of Plaintiffs and the Subclass Members.

142.    Defendant continued to misrepresent to consumers that the Product was "Fluorine free" and "PFAS free."  However, as described, this is not necessarily the case.

143.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiffs and other class members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiffs and Class members were injured in fact and lost money and property as a result.

144.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

145.    As a result of Defendant's wrongful conduct, Plaintiffs and the class members lost money in an amount to be proven at trial.  Plaintiffs and the class members are therefore entitled to restitution as appropriate for this cause of action.

146.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V
### (Fraud)

147.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

148.    Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

149.    At the time Plaintiffs and Class members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Product as "Fluorine free" and  "PFAS free,"

despite containing fluorine which indicates the existence of PFAS.

150.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed safe for use.

151.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

152.    Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

153.    Plaintiffs and Class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

154.    Plaintiffs and Class members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

Plaintiffs and Class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## <u>COUNT VI</u>
### (Constructive Fraud)

155.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

156.    Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

157.    At the time Plaintiffs and Class members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

158.    Defendant affirmatively misrepresented the Product, giving the Products the appearance of a product that is indeed safe for use.

159.    Defendant also knew that its omissions and misrepresentations regarding the Product

were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

160.     Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiffs and class members relied upon Defendant to make full disclosures based upon the relationship between Plaintiffs and class members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

161.     Plaintiffs and Class and Subclass members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

162.     Plaintiffs and class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

163.     Plaintiffs and class members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

164.     Defendant breached its duty to Plaintiff and class members to make full disclosures of the safety of its Products.

165.     Plaintiffs and class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiffs and class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Inducement)

166.     Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

167.   Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

168.   Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

169.   Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

170.   Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

171.   Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

172.   Plaintiffs and class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

173.   Plaintiffs and class members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Products, and what information was available regarding the Products.

174.   Defendant intended to induce—and did, indeed, induce—Plaintiffs and class members into purchasing the Products based upon their affirmative representations and omissions.

175.   Plaintiffs and class members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiffs and class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Money Had and Received)

176.   Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

177.    Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

178.    As a result of the Plaintiffs' and Class Members' purchase of the Product, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiffs and class members in an amount to be determined at trial.

179.    No part of any of the monies due and owing to Plaintiffs and class members has been repaid, although Plaintiffs and class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT IX
### (Fraudulent Concealment or Omission)

180.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

181.    Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

182.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

183.    Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

184.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

185.    Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

186.    Defendant made these material misrepresentations to boost or maintain sales of the Products, and in order to falsely assure purchasers of the Product that Defendant is a reputable company and that its Products are safe for use.  The false representations were material to consumers because the representations played a significant role in the value of the Products purchased.

187.    Plaintiffs and class members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.  Plaintiffs and class members had no way of knowing that Defendant's misrepresentations as to the Products, and had no way of knowing that Defendant's misrepresentations were misleading.

188.    Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

189.    Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow their reputation as a premier designer and vendor of the Products.  Such benefits came at the expense of Plaintiffs and Class Members.

190.    Plaintiffs and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiffs' and class members' actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

191.    Due to Defendant's misrepresentations, Plaintiffs and Class Members sustained injury due to the purchase of the Product that did not live up to their advertised representations. Plaintiffs and class members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

192.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT X
### (Fraudulent Misrepresentation)

193.    Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

194.    Plaintiffs bring this claim individually and on behalf of the Class under the laws of the State of California.

195.    Defendant falsely represented to Plaintiffs and the Class that the Product was "PFAS free."

196.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

197.    Defendant knew or should have known that their representations about the Products were false in that the Products are not safe for use as discussed throughout.  Defendant knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

198.    Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment.  Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiffs' and the Classes' reliance on Defendant's misrepresentations was justifiable.

199.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Product and that it does not conform to the Products' labels, packaging, advertising, and statements.

200.    Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT XI
### (Negligent Misrepresentation)

201.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

202.    Plaintiffs bring this claim individually on behalf of the Class under the laws of the State of California.

203.    Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

204.    Defendant breached their duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

205.    Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Products were not safe for use.

206.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not safe for use and that the Products do not conform to the Products' labeling, packaging, advertising, and statements.

Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

### COUNT XII
#### (Quasi-Contract / Unjust Enrichment)

207.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

208.    Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class under the laws of the State of California.

209.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

210. Plaintiffs and Class Members conferred benefits on Defendant by purchasing the Products.

211. Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for their intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts were known.

212. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

**COUNT XIII**
**(Breach of Express Warranty)**

213. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

214. Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class under the laws of the State of California.

215. Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Products.

216. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products packaging and through marketing and advertising, as described above.

217. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

218. As set forth above, Defendant purports through their advertising, labeling, marketing, and packaging, to create an express warranty that the Products are safe for its intended use.

219. Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

220. Defendant breached express warranties about the Products and their qualities because

despite Defendant's warranties that the Products are "Fluorine free" and "PFAS free," the Product is not free of fluorine which indicates that the Products contain PFAS. Thus, the Products did not confirm to Defendant's affirmations and promises described above.

221. Plaintiffs and each Class Member would not have purchased the Products had they known the true nature of the Products.

222. As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

223. Plaintiffs, through counsel, sent Defendant a letter via certified mail return receipt requested, apprising Defendant of its breach of warranties in accordance with U.C.C. §§ 2-313, 2-314, and 2-607. Defendant responded on March 25, 2022, denying all responsibility.

## COUNT XIV
### (Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)

224. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

225. Plaintiffs bring this claim individually and on behalf of the members of the Class under the laws of the State of California.

226. The Products are a consumer product as defined in 15 U.S.C. § 2301(1).

227. Plaintiffs and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

228. Defendant is a supplier and warrantor as defined in 15 U.S.C § 2301(4) and (5).

229. In connection with the marketing and sale of the Products, Defendant impliedly warranted that the Product was fit for use and expressly warranted that the Product was "PFAS free." However, as described throughout, it is not true.

230. By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiffs and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C §§ 2301, *et seq.*, thereby damaging Plaintiffs and the Class.

231. On February 25, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a pre-suit notice letter, apprising Defendant of its breach of warranties. The letter was

sent via certified mail, return receipt requested.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant responded to the letter on March 25, 2022, refusing to make any changes to the Products, or to pull the Products from the marketplace.

232.    Plaintiffs and the Class Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they knew the truth about the Products.

## COUNT XV
### (Negligent Failure to Warn)

233.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

234.    Plaintiffs bring this claim individually and on behalf of members of the Class under the laws of the State of California.

235.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of the Products.

236.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiffs and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

237.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiffs and the Class of all dangers associated with the intended use of the Products.

238.    At minimum, the duty arose for Defendant to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

239.    Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Products, including Plaintiff and the Class, regarding

the true nature of the Products, its risks, and potential dangers.

240.    Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contain ingredients known to cause adverse health effects in humans.

241.    Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Products as described herein, and knew that Plaintiffs and Class Members could not reasonably be aware of those risks.  Defendant failed to exercise reasonable care in providing Plaintiffs and the Class with adequate warnings.

242.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Products, including its intended use, could cause and has caused injuries and other damages, Plaintiffs and the Class have suffered damages, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the Subclass and Plaintiff's attorneys as Class Counsel;

B.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs, the nationwide Class, and the California and Pennsylvania Subclasses on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper;

H.    For an order awarding Plaintiffs and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit; and

I.     For medical monitoring as a means to safeguard Plaintiffs' and Class Members' health and to mitigate any damages for future medical treatment.

### **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  April 7, 2022              Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Sean L. Litteral*
         Sean L. Litteral

Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Rachel L. Miller (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: rmiller@bursor.com

*Attorneys for Plaintiff*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Sean L. Litteral, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., and counsel of record for Plaintiffs Gemma Rivera and Marisa Franz, both of whom reside in San Jose, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California.   Additionally, Defendant transacts substantial business in this District, including the purchases and Products at issue, and Defendant advertised and marketed the Products at issue to Plaintiffs in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, this 7th day of April, 2022.


　　　　　　　　　*/s/ Sean L. Litteral*
　　　　　　　　　Sean L. Litteral