Michael M. Maddigan (SBN 163450)
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone: (310) 785-4600
Facsimile:  (310) 785-4601
michael.maddigan@hoganlovells.com

Lauren S. Colton (*Pro Hac Vice Forthcoming*)
Marc A. Marinaccio (*Pro Hac Vice Forthcoming*)
**HOGAN LOVELLS US LLP**
100 International Drive, Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2700
Facsimile: (410) 659-2701
lauren.colton@hoganlovells.com
marc.marinaccio@hoganlovells.com

Attorneys for Defendant KNIX WEAR INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEMMA RIVERA and MARISA FRANZ, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>KNIX WEAR INC.,<br><br>     Defendant. | Case No. 5:22-cv-02137-EJD<br><br>Hon. Edward J. Davila<br><br>**DEFENDANT KNIX WEAR INC.'S NOTICE OF MOTION AND MOTION FOR RULE 11 SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEREOF**<br><br>Hearing Date: November 10, 2022<br><br>Time: 9:00 am<br><br>Courtroom: 4—5th Floor |

1

## TABLE OF CONTENTS

2

**Page**

3

4

I.      INTRODUCTION ..................................................................................................2

II.     BACKGROUND ...................................................................................................4

5

        A.      Knix...........................................................................................................4

6

        B.      PFAS and Fluorine....................................................................................5

7

        C.      PFAS and Menstrual Underwear ..............................................................8

8

        D.      The Mamavation Blog Post.......................................................................9

9

        E.      Plaintiffs' Demand Letter and Complaint ...............................................12

10

        F.      Media and Customer Response to Plaintiffs' Unfounded Accusations ................15

11

III.    ARGUMENT .......................................................................................................15

12

        A.      Rule 11 Requires A Signing Attorney to Personally Conduct a Reasonable Inquiry Into Factual Assertions in a Complaint .....................15

13

        B.      Plaintiffs' Attorneys Did Not Conduct a Reasonable Inquiry to Determine the Accuracy of the Key Allegation In This Lawsuit ..............17

14

15

        C.      The Complaint Contains Several Other Inaccurate or Misleading Allegations That Reflect a Lack of Reasonable Pre-Suit Investigation ....................20

16

        D.      Plaintiffs' FAC Should Be Stricken and Knix Should Be Awarded Costs of Defense......................................................................................22

17

18

IV.     CONCLUSION....................................................................................................24

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abbas v. Vertical Ent., LLC*,

5

   No. 2:18-CV-7399-CBM-AFM, 2019 WL 8012677 (C.D. Cal. Oct. 18, 2019),

6

   *aff'd*, 854 F. App'x 816 (9th Cir. 2021) ...................................................................................24

7

*Abbott Point of Care, Inc. v. Epocal, Inc.*,
   908 F. Supp. 2d 1231 (N.D. Ala. 2012) .................................................................................19

8

*Andrews v. Procter & Gamble Co.*,

9

   No. EDCV-19-00075-AG-(SHKx), 2019 WL 6520045 (C.D. Cal. June 3,
   2019) .................................................................................................................................7, 13

10

*Atkins v. Fischer*,

11

   232 F.R.D. 116 (D.D.C. 2005) ...............................................................................................22

12

*Attia v. Google LLC*,

13

   No. 17-CV-06037-BLF, 2018 WL 2971049 (N.D. Cal. June 13, 2018) .....................15, 22, 23

14

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*,
   712 F. Supp. 2d 255 (S.D.N.Y. 2010) ..............................................................................16, 17

15

*Balistreri v. McCormick & Co., Inc.*,

16

   No. 5:22-cv-00349-EJD (N.D. Cal. Jan. 18, 2022) .................................................................14

17

*Blenis v. Thinx*,
   No. 1:21-cv-11019-IT (D. Mass. June 18, 2021) .....................................................................9

18

*Brooks v. United Dev. Funding III, L.P.*,

19

   No. 4:20-CV-00150-O, 2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ...................................23

20

*In re Connetics Corp. Sec. Litig.*,

21

   542 F. Supp. 2d 996 (N.D. Cal. 2008) ..............................................................................15, 23

22

*Cook v. Peter Kiewit Sons Co.*,
   775 F.2d 1030 (9th Cir. 1985)................................................................................................23

23

*Dawood v. Gamer Advantage, LLC*,

24

   No. 2:22-cv-00562-WBS-KJN (E.D. Cal. Mar. 28, 2022) ......................................................14

25

*Gergawy v. United States Bakery, Inc.*,

26

   No. 2:19-CV-00417-SAB, 2022 WL 395308 (E.D. Wash. Feb. 8, 2022) ...............................23

27

*Graham v. City of S. Lake Tahoe*,
   No. 2:10-CV-2335 JAM-KJM, 2011 WL 2066769 (E.D. Cal. May 25, 2011) ........................18

28

*Hamman v. Cava Grp., Inc.*,
   3:22-cv-00593-MMA-MSB (S.D. Cal. Apr. 27, 2022)........................................14, 18

*Holgate v. Baldwin*,
   425 F.3d 671 (9th Cir. 2005)...................................................................................15

*Hunt v. Sunny Delight Beverages Co.*,
   No. 8:18-cv-00557-JLS-DFM, 2018 WL 6786265 (C.D. Cal. Dec. 18, 2018) .......................24

*Hussain v. Burger King Corp.*,
   No. 4:22-cv-02258-HSG (N.D. Cal. Apr. 11, 2022)..........................................14, 18

*Ideal Instruments, Inc. v. Rivard Instruments, Inc.*,
   243 F.R.D. 322 (N.D. Iowa 2007) ...........................................................................17

*Judin v. United States*,
   110 F.3d 780 (Fed. Cir. 1997)..................................................................................19

*Kanan v. Thinx*,
   No. 2:20-cv-10341-JVS-JPR (N.D. Cal. Nov. 12, 2020)...........................................8

*Lloyd v. Schlag*,
   884 F.2d 409 (9th Cir. 1989)...................................................................................15

*Lupia v. Recreational Equip., Inc.*,
   No. 4:22-cv-02510-JSC (N.D. Cal. Apr. 25, 2022) ....................................................14

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   No. 2:10-CV-0302 MRP, 2011 WL 4389689 (C.D. Cal. May 5, 2011)...........................15, 23

*Mogan v. Sacks, Ricketts & Case LLP*,
   No. 21-CV-08431-TSH, 2022 WL 119212 (N.D. Cal. Jan. 12, 2022) ....................................24

*O'Rourke v. Dominion Voting Sys. Inc.*,
   No. 20-CV-03747-NRN, 2021 WL 3400671 (D. Colo. Aug. 3, 2021), *modified
   on reconsideration*, No. 20-CV-03747-NRN, 2021 WL 5548129 (D. Colo.
   Oct. 5, 2021)............................................................................................................17

*Rattagan v. Uber Techs., Inc.*,
   No. 19-CV-01988-EMC, 2019 WL 3891714 (N.D. Cal. Aug. 19, 2019)...............................24

*Schoggen v. Hawaii Aviation Cont. Servs., Inc.*,
   No. CIV. 12-00049 LEK, 2012 WL 5354431 (D. Haw. Oct. 29, 2012), *aff'd*,
   608 F. App'x 469 (9th Cir. 2015) ...........................................................................18

*Solis v. Covergirl Cosmetics*,
   No. 3:22-cv-00400-BAS-NLS (S.D. Cal. Mar. 25, 2022) .................................14, 18

*Urenia v. Pub. Storage*,
   No. CV-13-01934-DDP-AJWX, 2015 WL 3378247 (C.D. Cal. May 7, 2015).......................16

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................................15

*Walker v. S.W.I.F.T. SCRL*,
    517 F. Supp. 2d 801 (E.D. Va. 2007) ..........................................................................................16

**Other Authorities**

Fed. R. Civ. P. 11 ................................................................................................................ *passim*

1

## NOTICE OF MOTION AND MOTION FOR SANCTIONS

2    PLEASE TAKE NOTICE that on November 10, 2022 at 9:00 am in Courtroom 4, before

3 the Honorable Edward J. Davila, Defendant Knix Wear Inc. will and hereby does move this Court

4 for an order for Sanctions, pursuant to Rule 11 of the Federal Rules of Civil Procedure, on the

5 grounds that Plaintiffs' counsel did not conduct a reasonable and competent inquiry prior to filing

6 this lawsuit and the First Amended Complaint to confirm that Plaintiffs' key factual contentions

7 have evidentiary support.

8    Defendant request sanctions in the form of: (1) an order striking the allegations in Plaintiffs'

9 First Amended Complaint that Defendant's products contain fluorine, PFAS or fluorine indicative

10 of PFAs, or otherwise suggesting that Defendant's products are unsafe or not sustainable; (2) an

11 order that Plaintiffs' counsel pay Defendant's costs and attorneys' fees for bringing this motion and

12 defending this matter; and (3) any additional sanctions or other relief the Court determines to be

13 just and proper.

14    This Motion is based on this Notice of Motion and Motion, the accompanying

15 Memorandum of Points and Authorities, the concurrently filed Declarations of Joanna Griffiths and

16 Michael M. Maddigan and exhibits thereto, the pleadings, records, and files in this action, and any

17 argument that the Court may entertain at any hearing on this matter.

18

19    Date:  June 11, 2022                **HOGAN LOVELLS US LLP**

20

21    By:  /s/ *Michael M. Maddigan*
                 Michael M. Maddigan (Bar No. 163450)
22                 *Attorney for Defendant*
                 *KNIX WEAR INC*

23

24

25

26

27

28

1

1

2 <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

3        Defendant Knix Wear Inc. ("Knix") respectfully submits this Memorandum of Points and

4 Authorities in Support of Its Motion for Sanctions under Rule 11 of the Federal Rules of Civil

5 Procedure.

6 **I.    <u>INTRODUCTION</u>**

7        This consumer protection lawsuit hinges entirely on the allegation that certain Knix

8 leakproof menstrual underwear products purportedly contain fluorine, a chemical that Plaintiffs

9 contend is an "indicator" that the products may also contain potentially harmful polyfluoroalkyl

10 substances ("PFAS").  Plaintiffs contend that Knix's representations that its products are free

11 from PFAS and fluorine, based on Knix's extensive testing conducted by third-party laboratories,

12 are inaccurate or misleading.  But Plaintiffs and their counsel, Sean Litteral and Rachel Miller of

13 the law firm Bursor & Fisher, P.A., have ***no idea*** whether any Knix product actually contains

14 fluorine or not, let alone the specific type of fluorine (organic fluorine) that can potentially

15 indicate the presence of PFAS.  Indeed, they conducted no independent investigation whatsoever

16 to even attempt to confirm the truth of that assertion.

17        Plaintiffs' allegation that Knix products contain fluorine – and their resulting implication

18 that those products may contain PFAS – is based entirely on a blog post published by

19 "Mamavation," an affiliate "mom blogger" with no scientific background who receives financial

20 compensation from various apparel brands, including Knix competitors, for directing its readers

21 to those competitors' websites.  Mamavation claims that it sent menstrual underwear samples

22 manufactured by Knix and several other companies to an unidentified lab, which purportedly

23 found traces of fluorine in two Knix products.  Mamavation does not, however, provide any detail

24 regarding how the testing was conducted that would allow Mr. Litteral, Ms. Miller, this Court, or

25 anyone else to assess its reliability – it did not post the test results, identify the testing procedures

26 or testing conditions or explain how the samples were collected and prepared (or whether any

27 precautions were taken to prevent fluorine contamination from external sources).  Those factors

28 are important, because fluorine is ubiquitous in the environment and Mamavation itself

acknowledges that fluorine detection can result from contamination before or during the testing process.  Additionally, the Mamavation blog fails to indicate whether the Knix products purportedly tested positive for *organic* fluorine, which can potentially suggest the presence of PFAS,[1] or *inorganic* fluorine (such as fluoride salts and minerals), which cannot – a key distinction Mamavation acknowledges in some of its other blog posts involving other products.  This is particularly important, because total fluorine (and specifically inorganic fluorine) is *not* a potential indicator for PFAS, and Mamavation's failure to distinguish between organic and inorganic fluorine should have lead a diligent attorney to conclude that the blog post alone cannot reasonably be used as the basis for filing a PFAS lawsuit against Knix.  This distinction is especially critical here because Mr. Litteral has acknowledged the difference between organic and inorganic fluorine in multiple lawsuits he has filed against other companies, yet conveniently ignores it in this case, instead relying on Mamavation's results to support a proposition he knows to be inaccurate.

Nevertheless, in February 2022, Mr. Litteral sent Knix a letter threatening to file a class action lawsuit alleging that various Knix products contain PFAS, based entirely on the Mamavation blog post.  Knix provided a detailed response, pointing out numerous reasons why Mamavation's reports of fluorine detection are unreliable and providing a link to Knix's actual PFAS and fluorine testing reports that have been available on Knix's website since January 2020 (and updated regularly since that time).  Those reports show no detected PFAS or fluorine in the products at issue.  Knix also asked Mr. Litteral whether he or his firm had conducted or was aware of any independent testing – other than the anonymous testing reported by Mamavation – that showed either PFAS or fluorine in Knix products.  Mr. Litteral refused to engage.  Instead, he and Ms. Miller simply filed this lawsuit, asserting in a complaint signed pursuant to Rule 11 that Knix products contain PFAS and fluorine.  After the filing, Knix sent another letter to Mr. Litteral

---

[1] As discussed below, even organic fluorine testing methods are subject to interference from various non-PFAS substances and contaminants; thus positive results do not necessarily indicate the presence of PFAS.

and Ms. Miller, advising them that the filing violated Rule 11 and that Knix intended to proceed with a motion.  The next day, Mr. Litteral and Ms. Miller filed an amended complaint, removing direct allegations that Knix products contain PFAS, but repeating their unfounded allegations that the products "contain[] fluorine which indicates the presence of PFAS," again premised entirely on the dubious Mamavation report of anonymous testing using a method that they know does not even support that claim.

Rule 11 exists to prevent this very type of "file first and ask questions later" pleading. The license to practice law grants lawyers a privilege to file defamatory statements in court that, in any other circumstance, would subject the publisher to a libel lawsuit and a judgment in damages.  That is why Rule 11 imposes an obligation on the signing attorney to establish an evidentiary basis for claims prior to filing a complaint, including that all factual statements have evidentiary support.  The Rule requires that the filing attorney *personally* conduct a reasonable investigation; it does not allow him to simply regurgitate unsupported and defamatory accusations from internet bloggers who are not subject to Court rules.  By asserting that Knix products contain potentially harmful chemicals in a publicly-filed pleading, without any personal investigation whatsoever, Mr. Litteral and Ms. Miller have completely ignored their Rule 11 obligations, and have caused Knix to incur significant costs of defense as well as substantial reputational harm.

## II.   BACKGROUND

### A.   Knix

Knix is a Toronto-based company that manufacturers several different types of intimates and leisurewear products, including underwear, bras, swimwear and active wear.  (Griffiths Decl. ¶ 2).[2]  Knix's most well-known product is its "Leakproof Underwear" – a patented line of period underwear first launched in 2013 as a sustainable alternative to single-use pad and tampon menstrual solutions.  (*Id.* ¶ 3).  Many disposable menstrual products contain plastics and other

---

[2]  Reference is made to the Declaration of Joanna Griffiths dated May 19, 2022 ("Griffiths Decl."), filed simultaneously herewith.

non-degrading chemicals, including tampon applicators, the sticky layer of many brands of pads, product wrappers and other packaging materials, which end up in landfills after a single use.  (*Id.* ¶ 4).  Knix's period underwear products are designed to be washed and reused dozens or even hundreds of times, which allows customers another way to cut down on single-use plastics.  (*Id.* ¶ 5).  Leakproof underwear provides the wearer with peace of mind regarding potential period leaks and has been viewed as a monumental step in gender and period equality.  (*Id.* ¶ 6).

Knix's patented Leakproof Underwear is made up of separate layers of materials designed to absorb and move moisture away from the skin, while preventing moisture from leaking through the product.  (*Id.* ¶ 7).  Knix offers different products with varying levels of absorbency designed for different portions of the menstrual cycle, but generally each product contains three layers – a moisture-wicking cotton-based layer nearest the skin, an absorbent "moisture-locking" layer in the middle and a moisture-impermeable outer layer to prevent leaking.  (*Id.* ¶ 8).

### B.   PFAS and Fluorine

PFAS (per- and polyfluoroalkyl substances) are synthetic chemicals that are widely used by some manufacturers in various consumer, commercial and industrial products.  (*See* First Amended Complaint ("FAC"), ECF No. 9, ¶¶ 2, 29-30; Ex. 1).[3]  There are thousands of different PFAS, some of which have been more widely used and studied than others, but one common characteristic is that many PFAS break down very slowly.  (Ex. 1).  Because of their widespread use and the persistence of some PFAS in the environment, PFAS are found throughout the world in water, air and soil.  (*Id.*).  However, the EPA has advised that health effects associated with PFAS are "difficult to specify" for several reasons, including that "[t]here are thousands of PFAS with potentially varying effects of toxicity levels, yet most studies focus on a limited number of better known PFAS chemicals," and that the "types and uses of PFAS change over time, which makes it challenging to track and assess how exposure to these chemicals occurs and how they

---

[3]  A copy of United States Environmental Protection Agency ("EPA"), "PFAS Explained," is attached as Exhibit 1, and also is available at: https://www.epa.gov/pfas/pfas-explained.

will affect human health." (Ex. 2).[4]   In recent years, companies across several different

industries have come under fire for using PFAS in their products.[5]

All PFAS compounds contain the element fluorine (that is the "F" in "PFAS").  However,

fluorine can exist in either *organic* fluorine or *inorganic* fluoride molecules, which have distinct

chemical properties.  The type of fluorine contained in PFAS is *organic* fluorine.[6]  PFAS do *not*

contain *inorganic* fluoride, which exist naturally in the environment in several different forms,

including in drinking water and salt water.  Inorganic fluorides (compounds containing fluorine)

also are found in many common food items, such as black tea, raisins, potatoes and lettuce.  (*See*

Ex. 3).[7]

One way to screen for the potential presence of PFAS in a product is to test it for *organic*

fluorine.  Importantly, however, testing a product for *total* fluorine, without first taking steps to

remove any *inorganic* sources of fluorine from the sample, is not a reliable indicator of whether

the product could contain PFAS, because positive total fluorine results could be caused by the

---

[4]  A copy of EPA, "Our Current Understanding of the Human Health and Environmental Risks of PFAS," is attached as Exhibit 2, and also is available at: https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.

[5]  *See* Emily Field, "What to Know About the Growing PFAS Litigation," Law 360 (Feb 23, 2022), *available at*: https://www.law360.com/articles/1466351.

[6]  PFAS are organic fluorinated compounds, meaning that they contain carbon.  The root "*alkyl*" in the terms per- and polyfluoro*alkyl* substances (PFAS) refers to alkanes, a specific type of carbon-based structure.  By definition, chemicals that contain carbon are organic chemicals, whereas chemicals that do not contain carbon are inorganic chemicals.  *See generally* https://pfas-1.itrcweb.org/2-2-chemistry-terminology-and-acronyms/ (discussing the chemistry and terminology of PFAS).

[7]  A copy of Anne Helmenstine, "What Is Fluoride? Fluoride vs. Fluorine," Science Notes (Sept. 30, 2021), cited in the FAC at paragraph 54, is attached as Exhibit 3, and also is available at: https://sciencenotes.org/what-is-fluoride-fluoride-vs-fluorine/.

presence of inorganic rather than organic fluorine.  The EPA has acknowledged this crucial

distinction in published guidance relating to the use of fluorine testing to detect potential PFAS,

and has expressly advised that "[r]emoving the background inorganic F⁻ from the sample is

important to make sure that the reported F⁻ is organic."  (Ex. 4).[8]  It also recently proposed a new

PFAS screening method by measuring organic fluorine, which expressly requires the removal of

inorganic fluoride prior to testing.[9]  A positive result for fluorine (either organic or inorganic) also

can result from contamination from other sources – if, for example, a cleaning solution is used on

the product itself or a surface the product has come into contact with prior to testing, that

contamination might cause a positive result even where the product itself is fluorine-free.[10]  Thus,

for several reasons, a positive result for fluorine – and particularly total fluorine – does ***not***

necessarily mean that a product contains PFAS.[11]

_____

[8]  Impellitteri, C.A., Mills, M., Gillespie, A., "Update on PFAS Analytical Methods," US EPA

Office of Research and Development, attached as Exhibit 4 and also available at:

https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=540520&Lab=CESER.

[9]  *See* EPA, Draft Method 1621 (April 2022), available at:

https://www.epa.gov/system/files/documents/2022-04/draft-method-1621-for-screening-aof-in-aqueous-matrices-by-cic_0.pdf.

[10]  *See id.* § 4.0 (discussing potential sources of fluoride cross-contamination that can impact

fluorine screening results, including "solvents, reagents, glassware or plasticware" used in the

testing lab).

[11]  The United States District Court for the Central District of California explained the distinction

in dismissing a complaint that relied solely on fluorine testing to support a claim that a product

contained PFAS:

> Plaintiff's sole authority for its allegation that "Oral-B Glide dental floss
> contain[s] ... elevated amounts of PFASs" is the PFASs Study. But the PFASs
> Study doesn't adequately support this allegation. Rather, the PFASs Study
> "hypothes[ized]" that Defendant's Oral-B Glide might be "a ***potential*** exposure
> source for PFASs." And that hypothesis was based on screening Defendant's
> dental floss for fluorine, which indicates that PFASs ***might*** be present.

### C.      PFAS and Menstrual Underwear

Knix has always been committed to ensuring that its products are safe for consumers. Starting in 2015, Knix made the decision to source the technical fabrics used in its period underwear from a supplier based in Italy, precisely because of the European Union's laws restricting the use of PFAS.  (Griffiths Decl. ¶ 9).  Knix also opted to develop fabrics with inherent physical properties to achieve its products' leakproof functionality – such as cotton with perforated holes to move moisture through the material and a moisture-impermeable fabric layer – instead of adding PFAS.  (*Id.* ¶ 10).  Knix has never intentionally added PFAS to its products. (*Id.*).

In January 2020, an investigative report published in the Sierra Club magazine revealed that menstrual underwear manufactured by a Knix competitor contained high levels of fluorine, based on testing conducted by a University of Notre Dame laboratory.  (Ex. 5).[12]  The scientist responsible for the testing, Dr. Graham Peaslee, opined that the high level of fluorine detected likely indicated the presence of PFAS, rather than fluorine present through environmental contamination.  (Ex. 6).[13]  The investigative report touched off a media firestorm and resulted in

---

*Andrews v. Procter & Gamble Co.*, No. EDCV-19-00075-AG-(SHKx), 2019 WL 6520045, at *3 (C.D. Cal. June 3, 2019) (dismissing complaint where plaintiff "clearly overstate[d]" the findings of fluorine-testing study in alleging that a product contained PFAS) (citations omitted, emphasis in original).

[12]  A copy of Jessian Choy, "My Menstrual Underwear Has Toxic Chemicals In It," Sierra Magazine (Jan. 7, 2020) is attached as Exhibit 5, and also is available at: https://www.sierraclub.org/sierra/ask-ms-green/my-menstrual-underwear-has-toxic-chemicals-it?utm_source=twitter&utm_campaign=sierramag&utm_medium=social.

[13] A copy of  Jessian Choy, "New Independent Study Confirms PFAS in Thinx, Other Products," Sierra Magazine (Jun. 3, 2021) is attached as Exhibit 6, and also is available at: https://www.sierraclub.org/sierra/ask-ms-green/new-independent-study-confirms-pfas-thinx-

1    the filing of multiple consumer protection lawsuits against the competitor.  *See Kanan v. Thinx*,

2    No. 2:20-cv-10341-JVS-JPR (N.D. Cal. Nov. 12, 2020); *Blenis v. Thinx*, No. 1:21-cv-11019-IT

3    (D. Mass. June 18, 2021).

4         Around this time, Knix engaged a third-party lab to directly test Knix's finished products

5    for certain PFAS commonly found in textiles.  That testing did not detect any of those PFAS in

6    any Knix menstrual underwear products.  (Ex. 7).[14]  Knix also engaged a separate laboratory to

7    test its products for organic fluorine (again, the type of fluorine that is present in PFAS).  (*Id.*).

8    Those results also came back negative.  (*Id.*).  Knix continues to conduct routine PFAS and

9    organic fluorine testing on its products, requires its suppliers to conduct PFAS testing of all

10   components of the product, and has posted a detailed explanation of its testing processes and

11   sample results on its website.  (*Id.*).  Knix's founder and CEO, Joanna Griffiths, also started a

12   change.org petition to advocate for stricter regulation of PFAS in period underwear and of PFAS-

13   related claims in consumer products generally.  (Ex. 8).[15]

14       **D.      The Mamavation Blog Post**

15         Notwithstanding Knix's test results and advocacy for stricter regulation of PFAS, on July

16   14, 2021, a blogger who operates a blog called "Mamavation" published a post claiming that

17   various period underwear brands' products, including Knix products, had tested positive for

18

19   ―――――――――――――――

20   other-

21   products#:~:text=Peaslee%20and%20his%20team%20found,All%20PFAS%20have%20fluorine.

22   [14]  A copy of "Knix News:  Yes. Knix Underwear are Toxic Chemical Free" (Jan. 21, 2020) is

23   attached as Exhibit 7, and also is available at:  https://knix.com/blogs/knix-blog/yes-knix-

24   underwear-are-toxic-chemical-free.

25   [15]  A copy of "Change.org: No More Toxins in My Underwear:  A Demand for Stricter Consumer

26   Safety Regulations" is attached as Exhibit 8, and also is available at:

27   https://www.change.org/p/consumer-product-safety-commission-create-customer-safety-

28   regulations-within-women-s-intimate-apparel-industry?redirect=false.

fluorine and thus, according to her, contained PFAS.  (FAC ¶¶ 37-39; Ex. 9).[16]  Mamavation describes itself as a "consumer watchdog, author, activist, community organizer, & strategist," but does not claim to have any scientific education or background.  (Ex. 10).[17]  Mamavation claims that its post about period underwear that included Knix "was medically reviewed by Sondra Strand, RN, BSN, PHN," but does not provide any information about Ms. Strand's background or indicate whether she has any expertise relating to PFAS or fluorine testing in the textile industry.  (Ex. 9).

Mamavation claims that two styles of Knix period underwear – specifically, Knix High Rise underwear and Knix Boyshorts – were tested for "total fluorine" by an "EPA-certified laboratory," and that the lab found 373 ppm of fluorine in the High Rise product and 43 ppm of fluorine in the Boyshorts product.  (*Id.*).  The blog post does not identify the lab or explain what is meant by "EPA-certified" – an odd descriptor given that the EPA does not require or award any "certification" for conducting PFAS or fluorine testing of textile products, nor has it promulgated any relevant standards for such testing.  Mamavation also does not provide a copy of the test results themselves or indicate how many pairs of each product were tested.  Nor does it provide any information regarding the testing procedures or conditions or what precautions (if any) were taken to ensure that the results were not impacted by external contamination.  And, it does not claim to have tested any Knix product for the presence of ***organic*** fluorine, which is telling because in other blog posts Mamavation has acknowledged that "[n]on-detect products only required one test for total fluorine, however, [products with] detectable amounts [of total fluorine]

---

[16]  A copy of "Mamavation:  Knix Period Underwear 'PFAS' Forever Chemicals Laboratory Results" (July 14, 2021) is attached as Exhibit 9, and also is available at:

https://www.mamavation.com/brands/knix-period-underwear-pfas-forever-chemicals-laboratory-results.html.

[17]  A copy of "Mamavation:  Leah Segedie's Official Bio" is attached as Exhibit 10, and also is available at: https://www.mamavation.com/about-leah-segedie.

required a second test to determine organic fluorine."  (*See, e.g.*, Exs. 11-13).[18]

Nevertheless, Mamavation ranked Knix's High Rise product as "not our favorite" because her testing purportedly found above 100 ppm total fluorine.  (Ex. 14).[19]  Of course, that 100 ppm threshold is ***not*** based on any industry standard applicable to fabrics.  Mamavation simply coopted a standard "used to determine if food packaging is compostable," and assumed that standard would translate to fabrics.  (*Id.*).  The blog acknowledges that it is "not a perfect standard," "make[s] no claims as to how much fluorine is dangerous vs. safe for dermal exposure in your vaginal area" (if any) and admits that "[w]e simply do not know."  (*Id.*).  Indeed, Mamavation uses different standards for testing different products, such as a 10 ppm standard for activewear, and appears to select arbitrary thresholds that will allow for sensationalized headlines.

---

[18]  A copy of "Mamavation: PFAS Found in Organic Tomato Pasta Sauce – Purchasing Guide 2022" (Apr. 12, 2022) is attached as Exhibit 11, and also is available at:

https://www.mamavation.com/food/pfas-in-organic-tomato-pasta-sauce-purchasing-guide.html;

*see also* "Mamavation: Green Beauty Cosmetic Guide – PFAS 'Forever Chemicals' & Makeup" (Nov. 30, 2021), a copy of which is attached as Exhibit 12, and also is available at:

https://web.archive.org/web/20211202015804/https://www.mamavation.com/beauty/green-beauty-cosmetic-makeup-guide-pfas-forever-chemicals.html (stating that if total fluorine was detected at a level above 10 ppm, the lab "then did a calculation to determine organic fluorine amounts"); "Mamavation: PFAS 'Forever Chemicals' in My LuLaRoe Leggings? Lab Reports" (Oct. 27, 2021), a copy of which is attached as Exhibit 13, and also is available at:

https://www.mamavation.com/product-investigations/lularoe-leggings-pfas-forever-chemicals.html (stating that after determining the total fluorine content, "a calculation is done to determine the amount of organic fluorine, which is indicative of PFAS.").

[19]  A copy of "Mamavation: Report: 65% of Period Underwear Tested Likely Contaminated with PFAS Chemicals" (May 24, 2021) is attached as Exhibit 14, and also is available at:

https://www.mamavation.com/health/period-underwear-contaminated-pfas-chemicals.html#Mamavations_Investigation_of_Period_Panties_Period_Underwear.

(*Compare* Ex. 14 *with* Ex. 15).[20]

Tellingly, Mamavation receives compensation for recommending products by brands that meet its arbitrary thresholds.  It even provides "affiliate links" and discount codes to websites operated by half-a-dozen Knix competitors and encourages its readers to purchase those competitors' menstrual underwear products.  (Ex. 9).  Indeed, one of the Knix-related posts was publicly criticized in comments by readers for failing to clearly disclose that Mamavation received a commission based on reader purchases.  (Ex. 14).  Other blog posts and a separate "Affiliate Disclosure" page, which appears to have been added to the website later in response to user comments, make clear that Mamavation receives compensation from the Knix competitors she recommends.  (Exs. 16, 17).[21]

**E.     Plaintiffs' Demand Letter and Complaint**

By letter dated February 25, 2022, Mr. Litteral notified Knix of his intent to file the present lawsuit.  (Ex. 18).[22]  Mr. Litteral's letter, apparently sent for purposes of complying with

---

[20]  A copy of "Mamavation: Non-Toxic Activewear Guide:  PFAS 'Forever Chemicals' in Workout Leggings & Yoga Pants" (Jan. 18, 2022) is attached as Exhibit 15, and also is available at: https://www.mamavation.com/product-investigations/non-toxic-activewear-guide-pfas-workout-leggings-yoga-pants.html.

[21]  A copy of "Mamavation: Non Toxic Alternatives to Thinx Period Underwear (Without PFAS)" (Jan. 20, 2020) is attached as Exhibit 16, and also is available at: https://www.mamavation.com/health/thinx-period-panties-test-positive-for-pfas.html (providing discount codes, such as "MAMA" or "MAMAV10," to purchase period underwear from recommended brands). A copy of "Mamavation: Affiliate Disclosure" is attached as Exhibit 17, and also is available at:  https://www.mamavation.com/affiliate-disclosure. The FAC describes Mamavation as a "non-profit organization" (FAC ¶ 27), but Mamavation does not represent itself to be a "non-profit" anywhere on the website and is not listed in the IRS's database of tax exempt organizations.  *See* https://apps.irs.gov/app/eos/allSearch.

[22]  A copy of Mr. Litteral's letter, dated February 25, 2022, is attached as Exhibit 18.

12

the CLRA's 30-day pre-suit notice requirement, cited the Mamavation blog post, accused Knix's products of containing PFAS and alleged that Knix had violated the CLRA and various warranties.  (*Id.*).  In conclusion, Mr. Litteral demanded that Knix make restitution to all purchasers of Knix products, or else he would file a class action lawsuit.  (*Id.*).

Knix responded by letter dated March 25, 2022.  (Ex. 19).[23]  In that letter, Knix provided several reasons why Mamavation's reports of anonymous testing are unreliable and insufficient to support the filing of a lawsuit consistent with Rule 11 obligations.  (*Id.*).  Knix also directed Mr. Litteral to a description of the testing Knix has conducted, together with samples of the actual test results, which contradict the Mamavation testing, and offered to discuss that testing in more detail with Mr. Litteral.  (*Id.*).  Finally, Knix invited Mr. Litteral to share any independent testing he or his firm may have conducted to support his assertions that Knix products contain PFAS.  (*Id.*).  Mr. Litteral declined to engage.  Instead, on April 4, he and Ms. Miller filed their original complaint in this action, which largely parroted the accusations in the demand letter that Knix products "contain PFAS" based on the Mamavation testing.  (*See* ECF No. 1 at ¶¶ 1, 4, 37-39).

By letter dated April 6, 2022, Knix requested that Mr. Litteral and Ms. Miller withdraw the complaint and dismiss the lawsuit, citing Rule 11.  (Ex. 20).[24]  Knix pointed Mr. Litteral and Ms. Miller to case law from this circuit dismissing previous attempts to conflate fluorine with PFAS, *see Andrews*, 2019 WL 6520045, at *3, and also cited several relevant Rule 11 decisions involving attorneys' failure to conduct a reasonable independent investigation prior to filing a lawsuit. (*Id.*).

On the next day, April 7, 2022, Mr. Litteral and Ms. Miller amended their complaint to remove certain allegations – namely, those that directly stated that Knix products contained PFAS – but declined to withdraw the complaint or cite any additional support for their allegations that Knix products contain fluorine or that total fluorine testing (as opposed to organic fluorine testing) is an "indicator" that a product contains PFAS.

---

[23]  A copy of Knix's response letter, dated March 25, 2022, is attached as Exhibit 19.

[24]  A copy of Knix's letter, dated April 6, 2022, is attached as Exhibit 20.

Mr. Litteral and Ms. Miller have filed at least half-a-dozen PFAS lawsuits in the last two months, all of which appear to rely entirely on third-party testing reported in articles, blog posts or litigation documents filed by other lawyers for their assertion that various products contain PFAS.[25]  Importantly, however, and as discussed in more detail in Section III.B below, other complaints filed by Mr. Litteral against other companies make clear that he understands that the total fluorine testing purportedly conducted by Mamavation and relied upon in this case may not indicate the presence of PFAS.

While Plaintiffs' FAC in this case contains several paragraphs of factual allegations that are cut-and-pasted word-for-word from the complaints in those lawsuits, it does not acknowledge the distinction between organic and inorganic fluorine or that Mamavation's testing may not indicate the presence of PFAS.  Knix is not in a position to comment as to Mr. Litteral and Ms.

---

[25]  *See, e.g.*, *Hamman v. Cava Grp., Inc.*, 3:22-cv-00593-MMA-MSB, Dkt. No. 1 at ¶¶ 1, 4, 38 (S.D. Cal., Apr. 27, 2022) (S. Litteral; alleging that food packaging contains PFAS based on testing conducted by Consumer Reports); *Lupia v. Recreational Equip., Inc.*, No. 4:22-cv-02510-JSC, Dkt. No. 1 at ¶¶ 1, 5 (N.D. Cal., Apr. 25, 2022) (S. Litteral & R. Miller; alleging that waterproof jackets contain PFAS based on "independent research conducted by Toxic-Free Future"); *Hussain v. Burger King Corp.*, No. 4:22-cv-02258-HSG, Dkt. No. 1 at ¶¶ 4, 39-40 (N.D. Cal., Apr. 11, 2022) (S. Litteral; alleging that food packaging contains PFAS based on testing conducted by Consumer Reports); *Dawood v. Gamer Advantage, LLC*, No. 2:22-cv-00562-WBS-KJN, Dkt. No. 1 at ¶¶ 4-5, 21-22 (E.D. Cal., Mar. 28, 2022) (S. Litteral; alleging that anti-fogging spray contains PFAS based on testing conducted by Duke University); *Solis v. Covergirl Cosmetics*, No. 3:22-cv-00400-BAS-NLS, Dkt. No. 1 at ¶¶ 1, 4 (S.D. Cal., Mar. 25, 2022) (S. Litteral; alleging that cosmetic products contain PFAS based on "independent research from Toxic Free USA," and citing to a lawsuit that organization recently filed in D.C. Superior Court); *cf. Balistreri v. McCormick & Co., Inc.*, No. 5:22-cv-00349-EJD, Dkt. No. 1 at ¶¶ 2, 19-21 (N.D. Cal. Jan. 18, 2022) (S. Litteral; alleging that spices contain toxic metals based on testing conducted by Consumer Reports).

Miller's pre-suit diligence with respect to those other cases, but here it is clear that they rushed to file the instant lawsuit using a template complaint based on the Mamavation post without even a modicum of independent investigation to determine the accuracy of their representations to this Court.

### F.   Media and Customer Response to Plaintiffs' Unfounded Accusations

Since Mr. Litteral and Ms. Miller filed their allegations that Knix products contain fluorine and/or PFAS, media coverage of this issue has increased and several articles, blog posts and other sources have drawn attention to the FAC.  (Griffiths Decl. ¶ 11).  As a result, individuals have cited the lawsuit in spreading misinformation regarding Knix products on social media, and several customers have contacted Knix to demand refunds for products they purchased based on the mistaken belief that those products contain harmful chemicals.  (*Id.* ¶ 12).

## III.   ARGUMENT

### A.   Rule 11 Requires A Signing Attorney to Personally Conduct a Reasonable Inquiry Into Factual Assertions in a Complaint

Rule 11 requires an attorney to conduct a "reasonable and competent inquiry" prior to filing a lawsuit and certify that "the factual allegations have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11; *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005); *Lloyd v. Schlag*, 884 F.2d 409, 412 (9th Cir. 1989).  That duty is non-delegable, and it requires that an attorney must "personally validate the truth and legal reasonableness of the papers filed."  *See, e.g., In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (imposing Rule 11 sanctions on attorney who relied on allegations made by others without investigating those allegations); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (same).  Importantly, "[u]nder Rule 11, Plaintiffs may not simply regurgitate" allegations from third-party sources – the rule requires an independent investigation.  *Attia v. Google LLC*, No. 17-CV-06037-BLF, 2018 WL 2971049, at *15 (N.D. Cal. June 13, 2018) (holding that allegations lifted from complaints in other lawsuits "should be disregarded unless and until Plaintiffs satisfy Rule 11(b)'s requirement

15

that they personally investigate their claims against Defendants"); *see also Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 811–12 (N.D. Cal. 2019) (noting that "Plaintiffs may not rely on a third party's investigation to satisfy their Rule 11 obligations" and dismissing fraud claims based entirely on uncorroborated allegations from an FTC investigation); *Urenia v. Pub. Storage*, No. CV 13-01934 DDP AJWX, 2015 WL 3378247, at *3 (C.D. Cal. May 7, 2015) (purported reliance on Los Angeles Times article insufficient to satisfy Rule 11's reasonable inquiry requirement).

Of course, the reasonableness of an attorney's investigation depends on the circumstances and the specific facts being alleged.  In some instances, it may be appropriate for an attorney to rely on a reputable news source's reporting of certain types of facts.  For example, courts have suggested that it may be permissible under Rule 11 for an attorney to rely on a newspaper article "reporting uncontroversial facts such as the public occurrence of an event, or the closing price of a corporation's stock, or weather conditions." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806–07 (E.D. Va. 2007) (citing cases).

However, courts have found that blind reliance on third-party sources does not satisfy Rule 11's "reasonable inquiry" obligation in situations like the one here.  In *Walker*, for example, the court sanctioned an attorney for relying entirely on a New York Times article for factual assertions where the article attributed those "facts" to "anonymous sources."  (*Id.*)  ("Reliance on anonymous sources is particularly troublesome under Rule 11 because unless the source is later identified, there is no way to verify the reliability of the information.").  "To conclude otherwise would allow parties to circumvent Rule 11's duty to conduct 'an inquiry reasonable under the circumstances,' and would serve to reduce that duty to the mere purchase of a newspaper."  (*Id.*) (internal citation omitted).

Similarly, a court in New York imposed Rule 11 sanctions where a party relied on an article for the "central" allegation to the complaint's "entire theory of fraud," where "any reasonable inquiry into the factual basis of the pleading would have prevented this mistake." *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 264 (S.D.N.Y. 2010) (noting that "[s]uch indifference to the truth of the pleading's single most important factual allegation" was particularly ironic "in the context of initiating a lawsuit that accuses another party

16

of making reckless misstatements of material fact").  As the District Court for the District of Colorado recently explained in sanctioning an attorney for relying on dubious media reports in asserting election fraud claims:

> Rule 11 imposes on lawyers a gatekeeper role, ensuring that potentially defamatory allegations are not made in public filings without an officer of the court having certified that a reasonable inquiry has been made as to their truth. Here, without making the necessary inquiries, Plaintiffs' counsel copied into their Complaint inflammatory and damaging allegations from failed lawsuits and media reports. Plaintiffs' counsel picked only the information, frequently from dubious sources, that supported their conspiracy theory, ignoring contrary available evidence, including statements from courts and non-partisan government agencies. They did not take any independent steps to verify the accuracy of the information by talking to actual human beings.

*O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 3400671 (D. Colo. Aug. 3, 2021), *modified on reconsideration*, No. 20-CV-03747-NRN, 2021 WL 5548129 (D. Colo. Oct. 5, 2021).

Courts also have not hesitated to sanction attorneys for relying on testing results by third-party "experts," particularly where flaws in the testing would have been apparent from reasonable inquiry.  *See Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 243 F.R.D. 322, 342–43 (N.D. Iowa 2007) ("Under the circumstances of this case, it is simply no excuse for Rivard and its counsel to assert that they relied on an 'expert' for the basis for their original preliminary injunction motion, precisely because the flaws in the 'expert's' evidence should have been so readily apparent on any reasonable examination or inquiry.").

### B.    Plaintiffs' Attorneys Did Not Conduct a Reasonable Inquiry to Determine the Accuracy of the Key Allegation In This Lawsuit

As in *Walker*, *In re Australia*, *O'Rourke* and *Ideal Instruments*, here Mr. Litteral and Ms. Miller utterly failed to conduct a reasonable inquiry.  Instead, they blindly relied on an anonymous source, cited on a dubious internet blog (a far cry from the New York Times) authored by a blogger with an obvious financial interest in promoting Knix's competitors, for the central factual allegation of their complaint.  As an initial matter, Mr. Litteral's PFAS lawsuits against other companies demonstrate that he understands that certain methods of fluorine testing – including the total fluorine method purportedly employed by Mamavation – may not indicate the

presence of PFAS.  In his complaints in *Solis* and *Hamman*, for example, he explains that the investigations on which his allegations are based tested specifically for ***organic*** fluorine, which Mr. Litteral contends "identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources."  *See Solis*, No. 3:22-cv-00400-BAS-NLS Dkt. No. 1 at ¶ 4 (S.D. Cal., Mar. 25, 2022); *see also Hamman*, No. 3:22-cv-00593-MMA-MSB, Dkt. No. 1 at ¶ 4 n.6 (S.D. Cal., Apr. 27, 2022); *Hussain*, No. 4:22-cv-02258-HSG, Dkt. No. 1 at ¶ 4 n.6 (N.D. Cal., Apr. 11, 2022).  Yet conspicuously absent from his complaint in the present case are any allegations that Mamavation – or Mr. Litteral and/or Ms. Miller – tested for organic fluorine or otherwise did anything to exclude the possibility that its results may have been impacted by fluorine from sources other than PFAS or from contamination.

But there is more.  Any reasonable review of the Mamavation blog – from its admission that the testing standard employed is not one that is used in the textile industry, to its acknowledgement that positive total fluorine results require a second test to determine the presence of organic fluorine, to its acknowledgement that positive fluorine results can occur from contamination, to its bolded and underlined affiliate links – should have put Mr. Litteral and Ms. Miller on notice that they should at least look into the factual basis for the purported positive fluorine test results.

Even if it had not, ***Knix itself*** did just that in multiple letters to Mr. Litteral.  *See, e.g.*, *Graham v. City of S. Lake Tahoe*, No. 2:10-CV-2335 JAM-KJM, 2011 WL 2066769, at *2 (E.D. Cal. May 25, 2011) (granting Rule 11 motion where plaintiff's counsel refused to dismiss defendant after being contacted by defendant's counsel with evidence that his allegations were baseless); *Schoggen v. Hawaii Aviation Cont. Servs., Inc.*, No. CIV. 12-00049 LEK, 2012 WL 5354431, at *3 (D. Haw. Oct. 29, 2012), *aff'd*, 608 F. App'x 469 (9th Cir. 2015) (granting Rule 11 motion for failure to make reasonable and competent inquiry where plaintiff was on notice of frivolousness of claim based on letter from defendant to plaintiff's counsel).

It would have been easy for Mr. Litteral and Ms. Miller to investigate their claims before filing suit.  They could have reviewed the third-party test results available on Knix's website that

show no detectable levels of PFAS or organic fluorine.   They could have accepted Knix's offer

to discuss additional testing results that multiple labs have conducted with respect to Knix

Leakproof products – all of which have reported no PFAS and no organic fluorine.  If they did not

want to "take Knix's word for it," Knix Leakproof Underwear retails for $23.00 to $28.00 per

pair – for less than the cost of the filing fee for the complaint, they could have purchased over a

dozen samples and sent them to an independent testing lab of their choice (presumably having

filed dozens of PFAS lawsuits in the last two months, the Bursor firm should be capable of

identifying an appropriate lab).

Courts have required no less in awarding Rule 11 sanctions for failure to conduct a

reasonable pre-suit inquiry.  For example, the Court of Federal Claims found that a trial court

abused its discretion in declining to grant Rule 11 sanctions where an attorney allowed his client

to proceed with a patent infringement claim without even obtaining and examining a sample of

the device at issue prior to filing suit:

> The court noted that Judin or Van Der Wall could have asked the Postal Service
> for a device to examine, but failed to do so. Nor does the record indicate that
> Judin or his counsel attempted to obtain the device, or a technical description of it,
> from HP or another vendor. Judin had explained that he did not do this because
> the scanning devices were made to Government specifications and were not
> readily available for disassembly because they were in use at Government
> installations. This explanation for not obtaining, or attempting to obtain, a sample
> of the accused devices from the Postal Service or a vendor was described by the
> court as "lame." The court noted that Judin could have purchased a device for a
> minuscule amount, compared to the cost of the litigation. The court concluded
> that it was "greatly troubled by the quality of the plaintiff's pre-filing examination,
> as well as the signing attorney's undue deference to Mr. Judin." . . . Under these
> circumstances, there is no doubt that Judin failed to meet the minimum standards
> imposed by Rule 11, and his attorney acted unreasonably in giving blind
> deference to his client and assuming his client had knowledge not disclosed to the
> attorney.

*Judin v. United States*, 110 F.3d 780, 782-84 (Fed. Cir. 1997);  *cf. Abbott Point of Care, Inc. v.*

*Epocal, Inc.*, 908 F. Supp. 2d 1231, 1238–39 (N.D. Ala. 2012) (distinguishing *Judin* and

declining to award sanctions only because plaintiff "***did*** actually obtain a sample of at least part of

the accused device [and] attempted to develop procedures to test [it], but the procedures either

proved ineffective, or they could not be implemented") (emphasis in original).

C.    **The Complaint Contains Several Other Inaccurate or Misleading Allegations That Reflect a Lack of Reasonable Pre-Suit Investigation**

In addition to their unsupported misrepresentation that Knix products contain fluorine, Plaintiffs make a number of other inaccurate or misleading representations regarding Knix, PFAS and fluorine that could have been avoided had their counsel conducted a reasonable pre-suit investigation instead of blindly relying on dubious internet bloggers.  For example, Plaintiffs misleadingly allege that Knix "bases its non-harmful substances claims on the fact that its Products are OEKO-TEX certified" (FAC ¶ 50), when in fact Knix's website makes clear that it engaged two separate laboratories to conduct ongoing PFAS ***and*** fluorine testing of finished Knix products (in addition to OEKO-TEX's certification of the supplier of the fabric used to manufacture the products).  (Ex. 7).  At best, Plaintiffs' contention that Knix "bases" its PFAS statements on its supplier's OEKO-TEX certification shows a complete lack of meaningful pre-suit review by counsel.  At worst, it suggests a deliberate attempt to mislead the Court.

Apparently conceding that they have no basis to allege that Knix products contain PFAS, Plaintiffs next argue that the purported presence of fluorine is "independently concerning" by misrepresenting various articles and internet sources.  (FAC ¶ 51).  Specifically, Plaintiffs misrepresent sources discussing ***elemental*** fluorine – a highly toxic and unstable form of pure fluorine that is different from PFAS, inorganic fluoride or any type of fluorine that could conceivably be present in consumer products – to suggest that the presence of fluorine alone indicates that a product is toxic or harmful.  (FAC ¶¶ 52-54 (citing Exs. 3, 21-22)).[26]  For

---

[26]  The sources Plaintiffs cite make clear that elemental solid fluorine exists only temporarily in laboratory conditions because it only becomes solid at -220°C.  In fact, scientists struggled for decades to study elemental solid fluorine because the process of cooling it to the necessary temperature resulted in explosions.  In contrast, those sources explain that fluorine its compounds are "an essential part of everyday life" and "can naturally be found in water, air, and both plant and animal-based foods in small amounts," and that "all humans and animals are exposed to and need minute amounts of fluorine."  *See* Technical University of Munich (TUM), "Fluorine: Toxic

20

example, one of the articles Plaintiffs cite states that "*[e]lemental* fluorine is highly toxic" and that its effects are "comparable to those of pure chlorine . . . ." (Ex. 3 (emphasis added)). Plaintiffs misleadingly omit the first part of the quote – noting that *elemental* fluorine is highly toxic – in order to suggest that the article applies to all forms of fluorine. (FAC ¶ 54). In fact, the article clearly explains that fluorine "rarely occurs in pure form," that fluorine ions and compounds are found in several common foods and in water and that fluoride is "likely a micronutrient" in small amounts. (Ex. 3). The idea that solid elemental fluorine, which exists only at temperatures far below zero degrees (Ex. 21), is present in Knix products is laughable. Plaintiffs' use of these sources to suggest that Knix's products are unsafe is not – it is flat-out misleading.

Plaintiffs also repeatedly and misleadingly conflate fluoride and fluorine to inaccurately suggest that regulation of *fluoride* limits in drinking water has any relevance to safe levels of *fluorine* (in any of its various forms) in consumer textile products. Specifically, Plaintiffs cite to a "Fact Sheet" from the Association of State and Territorial Dental Directors noting that the EPA has set a maximum limit of 4 ppm for fluoride for public water systems and that the U.S. Public Health Service has recommended fluoride content of 0.7 ppm in public drinking water. (FAC ¶¶ 56-57 (citing Ex. 23)).[27] Plaintiffs claim that the EPA has found that "*fluoride* becomes problematic to human health once that level is surpassed," but the source they cite does not say

_____

and aggressive, but widely used: Investigations with neutrons settle scientific dispute about the structure of solid fluorine," ScienceDaily (Mar. 27, 2019), cited in the FAC at paragraph 52 and attached as Exhibit 21, and also available at:

https://www.sciencedaily.com/releases/2019/03/190327112637.htm; Rachel Ross, "Facts About Fluorine," Live Science (Aug. 21, 2018), cited in the FAC at paragraph 53 and attached as Exhibit 22, and also available at: https://www.livescience.com/28779-fluorine.html.

[27]  A copy of Association of State and Territorial Dental Directors, "Natural Fluoride in Drinking Water," cited in the FAC at paragraphs 56-57, is attached as Exhibit 23, and also is available at: https://www.astdd.org/docs/natural-fluoride-fact-sheet-9-14-2016.pdf.

that.  (FAC ¶ 56).  Even if it did, the fact that the EPA has set limits for fluoride in drinking water is irrelevant – Plaintiffs have not alleged that any Knix products contain ***fluoride*** (much less in amounts greater than 4 ppm), nor have they alleged that the presence of fluoride in a garment could pose similar health risks to that in drinking water.

Finally, all PFAS are not created equal.  Plaintiffs generically allege that studies have shown that PFAS may be harmful to human health or to the environment, but the cited studies involve only a handful of specific PFAS, none of which are alleged to be present in Knix products.  (FAC ¶¶ 59-64).  Indeed, Plaintiffs fail to identify a ***single specific*** PFAS that they claim is present in Knix products, much less any of the specific PFAS at issue in those studies or at the levels involved therein.  Yet they make inflammatory comments that the products are "not safe," "pos[e] a significant health risk" and "are not fit for use by humans."  (FAC ¶¶ 6, 28, 68).

These false and misleading statements that litter the FAC are not just ancillary allegations – they go to the heart of Plaintiffs' case.  They suggest that counsel has either not read, or worse, deliberately misrepresented several cited sources.  Either way, sanctions are warranted under Rule 11.

### D.      Plaintiffs' FAC Should Be Stricken and Knix Should Be Awarded Costs of Defense

Rule 11 empowers the Court to award monetary and non-monetary sanctions against Mr. Litteral, Ms. Miller and Bursor & Fisher, P.A. "to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11.  Sanctions are warranted here to avoid a flood of PFAS-related lawsuits based on shoddy science and unsubstantiated "testing" from dubious internet sources – as evidenced by the number of such lawsuits Bursor & Fisher, P.A. have filed in the last two months alone.  *See* Note 25, *supra*.

The Court has considerable discretion with respect to ordering Rule 11 sanctions.  Among the "arsenal of options" available to the Court are "striking the offending paper." *See Atkins v. Fischer*, 232 F.R.D. 116, 126 (D.D.C. 2005) (quoting 1993 Advisory Committee Notes).  Indeed, "[g]iven the nondelegable duty imposed on attorneys under Rule 11, courts routinely strike allegations that rely exclusively on the analysis and investigation" of third parties.

1   *Attia*, 2018 WL 2971049, at \*15 (striking portion of complaint that "merely recites the allegations

2   and proceedings in six other lawsuits without indicating that Plaintiffs' attorneys conducted 'a

3   reasonable factual investigation' into those claims before filing").  Additionally, Rule 11

4   authorizes the Court to award "all of the reasonable attorney's fees and other expenses directly

5   resulting from the violation" and for "the reasonable expenses, including attorney's fees, incurred

6   for the [sanctions] motion."  Fed. R. Civ. P. 11(c)(2), (4).  As the Ninth Circuit has explained, an

7   award of attorney fees can be "an appropriate deterrent to future frivolous suits." *Cook v. Peter*

8   *Kiewit Sons Co.*, 775 F.2d 1030, 1037 (9th Cir. 1985) (quoting *Callow v. Amerace Corp.*, 681

9   F.2d 1242, 1243 (9th Cir. 1982)) (affirming sanctions).

10          The Court should do both here.  Mr. Litteral and Ms. Miller have made a statement of

11   purported fact – that Knix products contain fluorine indicative of PFAS – in a publicly filed court

12   document without conducting a reasonable inquiry into the truth of that assertion.  Their previous

13   filings in other lawsuits suggest that they have made that statement with knowledge of its

14   inaccuracy.  That statement has resulted in reputational harm to Knix (it has been repeated by

15   multiple media outlets since filing) and has caused customers to seek refunds for Knix purchases.

16   The only appropriate way to address that harm is for this Court to issue an order publicly

17   confirming that those statements were made without reasonable investigation and striking them

18   from the record in this lawsuit.  *See, e.g.*, *Attia*, 2018 WL 2971049, at \*15; *In re Connetics Corp.*,

19   542 F. Supp. 2d at 1005-06 (striking allegations made without reasonable independent

20   investigation pursuant to Rule 11, and granting simultaneously-filed motion to dismiss because

21   "the complaint cannot possibly make sufficient allegations against these defendants in the

22   absence of the stricken paragraphs"); *Brooks v. United Dev. Funding III, L.P.*, No. 4:20-CV-

23   00150-O, 2020 WL 6132230, at \*13 (N.D. Tex. Apr. 15, 2020) (striking allegations taken from

24   third-party source where "Plaintiffs and their attorneys have not provided the Court with any

25   certification that they independently investigated the allegations prior to their wholesale

26   incorporation into the Amended Complaint"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*,

27   No. 2:10-CV-0302 MRP, 2011 WL 4389689, at \*21 (C.D. Cal. May 5, 2011) ("Because Plaintiffs

28   have not reasonably investigated the allegations they copied from complaints in other cases, the

1  Court **GRANTS** Defendant Sieracki's motion to strike."); *cf. Gergawy v. United States Bakery,*

2  *Inc.*, No. 2:19-CV-00417-SAB, 2022 WL 395308, at *15 (E.D. Wash. Feb. 8, 2022) (striking

3  affidavit containing falsified evidence under Rule 11 after finding such sanctions "necessary in

4  this instance to preserve the integrity of the legal profession and judicial system").

5      Additionally, because the absence of any reasonable investigation prior to the filing of the

6  FAC necessitated a response from Defendants (in the form of a motion to dismiss, as well as this

7  motion), an award of attorneys' fees sufficient to reimburse Knix for their reasonable costs of

8  defending this matter are appropriate, including all costs incurred in preparing this motion and

9  Knix's motion to dismiss the FAC.[28]  *See, e.g., Mogan v. Sacks, Ricketts & Case LLP*, No. 21-

10  CV-08431-TSH, 2022 WL 119212, at *4 (N.D. Cal. Jan. 12, 2022) (awarding reasonable costs

11  and attorneys' fees for filing of frivolous lawsuit and failure to conduct reasonable pre-suit

12  inquiry); *Abbas v. Vertical Ent., LLC*, No. 2:18-CV-7399-CBM-AFM, 2019 WL 8012677, at *3

13  (C.D. Cal. Oct. 18, 2019), *aff'd*, 854 F. App'x 816 (9th Cir. 2021) (awarding defendants over

14  $50,000 in attorneys' fees for drafting motion to dismiss and Rule 11 motion where plaintiff's

15  attorney failed to investigate false jurisdictional allegations); *Hunt v. Sunny Delight Beverages*

16  *Co.*, No. 8:18-cv-00557-JLS-DFM, 2018 WL 6786265, at *5 (C.D. Cal. Dec. 18, 2018) (striking

17  consumer class action complaint and also awarding defendant attorneys' fees for drafting

18  sanctions motion and motion to dismiss); *cf. Rattagan v. Uber Techs., Inc.*, No. 19-CV-01988-

19  EMC, 2019 WL 3891714, at *5 (N.D. Cal. Aug. 19, 2019) (striking complaint for failure to make

20  reasonable pre-suit inquiry and awarding defendant attorneys' fees for preparing Rule 11 motion,

21  but declining to award costs for preparing motion to dismiss because the court did not reach the

22  arguments raised in that motion).

23  **IV.    CONCLUSION**

24      For the foregoing reasons, Defendant's Motion for Sanctions under Rule 11 should be

25  granted and Defendants should be awarded their costs of defending this lawsuit.

26  _____

27  [28] Knix will submit billing records from counsel sufficient to show the costs and attorneys' fees

28  incurred in connection with this motion and its motion to dismiss upon order from the Court.

1    Date:  June 11, 2022                    HOGAN LOVELLS US LLP

2

3                                     By:  */s/ Michael M. Maddigan*
                                          Michael M. Maddigan (Bar No. 163450)
4                                         Attorney for Defendant
                                          KNIX WEAR INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT KNIX WEAR INC.'S MOTION FOR SANCTIONS UNDER RULE 11
5:22-cv-02137-EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I certify, pursuant to 28 U.S.C. §1746, that I caused a copy of Defendant's Motion for Sanctions pursuant to Rule 11, together with supporting declarations and exhibits, to be served on counsel of record for Plaintiffs, Sean Litteral, at slitteral@bursor.com by email on May 19, 2022, that Mr. Litteral consented in writing to service of this Motion by email in accordance with Fed. R. Civ. P. 5(b)(2)(E), and that Mr. Litteral acknowledged receipt of the Motion on May 20, 2022.  Thus, service was effected more than 21 days before the filing of this motion in accordance with Fed. R. Civ. P. 11(c)(2).

*/s/ Lauren S. Colton*
Lauren S. Colton

DEFENDANT KNIX WEAR INC.'S MOTION FOR SANCTIONS UNDER RULE 11
5:22-cv-02137-EJD